UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

STAFFWORKS GROUP-WISCONSIN INC.,

    Plaintiff,

  v.            Case No. 18-C-392

SERVICE FIRST STAFFING INC., et al.,

    Defendants.

## DECISION AND ORDER

    Plaintiff Staffworks Group-Wisconsin Inc., d/b/a Nicolet Staffing (Nicolet), filed this action against its former employees, David Sanders and Kathryn Kienert, and Service First Staffing, Inc. (SFS), after Sanders and Kienert resigned from Nicolet to join SFS, a rival in the temporary staffing industry. Nicolet alleges that Defendants' misconduct illegally benefited its competitor and caused Nicolet to shutter its New London branch office and to suffer significant economic loss. The complaint asserts claims for misappropriation of Nicolet's trade secrets in violation of 18 U.S.C. § 1836, together with various state law claims including breach of contract, tortious interference with contract, breach of fiduciary duty, and misappropriation of confidential information. Nicolet's insurer, Zurich American Insurance Company, joined the action and asserted a subrogation claim against Defendants for money it paid for the alleged loss under its policy of insurance. Dkt. No. 34. The court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1332. Presently before the court is Defendants' motion for summary judgment. Dkt. No. 41. For the reasons that follow, Defendants' motion for summary judgment will be granted.

## BACKGROUND

Nicolet and SFS are staffing companies that provide temporary employees and related staffing services to their customers. Defs.' Statement of Undisputed Material Facts (DSMF), ¶¶ 1, 8, Dkt. No. 45. Staffing agencies, like SFS and Nicolet, evaluate potential employees for their customers—by screening for drug use, running criminal background checks, and evaluating their skills—before placing them with customers in need of temporary employees. *Id.* at ¶¶ 7–8. The staffing agencies are paid by the customers for whom they place temporary employees; they also handle the payroll of the temporary employees. *Id.* at ¶ 8.

Nicolet operates its staffing service in small towns throughout Wisconsin and the upper peninsula of Michigan. Pl.'s Additional Facts (PAF), ¶ 98, Dkt. No. 56. It is not a large company, never having exceeded 30 employees. *Id.* Nicolet was purchased from Wisconsin Staffing Services, Inc. by the Staffworks Group entities in December 2012 and formed a new company, Staffworks Group-Wisconsin, Inc., to house the assets of Nicolet. *Id.* at ¶ 99.

Before joining SFS, Defendants David Sanders and Kathryn Kienert worked together at Nicolet. When Nicolet was purchased in 2012, Sanders was the branch manager at the office in New London, Wisconsin. DSMF, ¶ 22. In this role, Sanders handled client, recruiting, marketing, and staffing matters for Nicolet. PAF, ¶¶ 125–27. He held this position until Nicolet promoted him to district manager in May 2015, which entailed new company and customer-related responsibilities and supervising additional branch offices (including offices in Medford, Menominee, Wisconsin Rapids, New London, and Eau Claire). DSMF, ¶ 23; PAF, ¶¶ 130–31. Nearly a year and a half later in October 2016, Nicolet's CEO told Sanders that Nicolet's new COO wanted to fire Sanders. DSMF, ¶ 24. However, instead of being fired, Sanders was told to report to another district manager and lost his supervisory role over the Medford and Menominee

2

branches. *Id.* at ¶ 25. Subsequently, and effective January 5, 2017, Sanders was again demoted so that he was branch manager of solely the New London branch and his base salary was reduced to $25,000 (he received additional income through commissions). *Id.* at ¶ 27.

On or about July 16, 2017, Sanders replied to a job posting for SFS about a position for an account manager. *Id.* at ¶ 40. Sanders accepted the position at SFS on or about July 31, 2017, after meetings with Tami Siekert (SFS's Wisconsin Rapids branch manager) and Pete Weslow (SFS's President). He claims the reasons for his decision to leave Nicolet and join SFS were his declining salary and the fact that warrants for unpaid taxes had been served on Nicolet by the Wisconsin Department of Revenue in May 2016. *Id.* at ¶¶ 38, 45. He notified Nicolet of his intent to resign from Nicolet on August 10, 2017, and was immediately terminated. He started work at SFS on August 16, 2017. *Id.* at ¶¶ 41–42, 46.

Sanders deleted all of his Nicolet emails on his work computer before departing Nicolet. *Id.* at ¶ 47. Nicolet claims that Sanders forwarded company documents to his personal email address over many years, intending to use them at a later time. PAF, ¶¶ 146–47. Sanders disputes this account, asserting that he forwarded emails to accommodate his travel schedule and track commissions, and denies that his deletion of emails prevented Nicolet from conducting business with its customers. DSMF, ¶¶ 47, 80. Sanders claims that he never shared any of this information with SFS. *Id.* at ¶ 80.

Kienert also worked at the New London branch of Nicolet. *Id.* at ¶ 35. She did not have official job duties outside of this branch. *Id.* Kienert directly reported to Sanders during her tenure at Nicolet. *Id.* at ¶ 36. She was his "right-hand person," who was eventually promoted to assistant branch manager. PAF, ¶128. Kienert, like Sanders, was neither a director nor officer of Nicolet. DSMF, ¶ 37.

Kienert desired to leave Nicolet and join Sanders at SFS once he announced his departure. *Id.* at ¶ 53. Kienert started working at SFS on September 5, 2017, in Wisconsin Rapids before she and Sanders opened a Waupaca branch for SFS on September 25, 2017. *Id.* at ¶¶ 55–56. Kienert's initial role was as a recruiter. *Id.*

At the time they began their employment with Nicolet, Sanders and Kienert each signed a "Non-Competition, Non-Disclosure and Non-Solicitation Agreement." *Id.* at ¶¶ 57–58. Sanders's Agreement identifies Staffworks Group-Wisconsin, Inc. as a counterparty, in addition to other Staffworks entities. *Id.* at ¶ 60. Kienert's Agreement did not identify the plaintiff, Staffworks Group-Wisconsin, Inc., as a counterparty; it listed "Brann Enterprises, Inc., Staffworks Group 2, Inc. and Staffworks Group 3, Michigan corporations, also doing business as Staffworks Group," which were collectively described as "Staffworks" in the agreement. *Id.* at ¶ 59. Nicolet claims this was an inadvertent scrivener's error, and Kienert's contract was intended to cover her employment with Nicolet. PAF, ¶¶ 119–20.

The non-compete clause of the Agreement provides that "[d]uring the term, Employee agrees not to, directly or indirectly, conduct any prohibited services within a fifty (50) mile radius of any branch or office." *Id.* at ¶ 110. "Services" is defined to "include the scope of employment, specific duties and work performed on behalf of Staffworks as part of its agreement or contract with [its] customers," including "temporary staffing, payroll services, recruitment, and direct hire placement." *Id.*

The non-disclosure clause provides that an employee "will not: (1) take, retain, or use Information or Staffworks's materials for Employee's own benefit; (2) disclose Information to any other entity except in a manner consistent with Staffworks's policies." *Id.* at ¶ 111. Information is defined as "information or materials that are considered trade secret, confidential and/or

4

proprietary by Staffworks," including "the development and provision of unique products and services," as well as:

> e-mails, e-blasts or communications, technical specifications, know-how, protocols, results of testing, data, scientific and medical information, strategic business plans, methodologies processes, financial information, product information, methods of operation, draft patent applications, customer information, supplier information, compilations of data software (both object code and source code), proposed agreements, weekly reports, monthly profit reports, client lists, business cards received during the solicitation or service of business[.]

*Id.* The non-disclosure also requires that each employee agree to:

> keep Information of Staffworks confidential. During and after Employee's employment Employee will not: . . . (3) delete, encrypt, password protect, or retain electronic files containing Information or Staffworks's materials (including emails and attachments); or (4) take any other action that impairs, restricts, limits, or impedes Staffworks's ability to have full access to and use of its Information, materials, and Workproduct.

*Id*. After employment at Nicolet is terminated, the employee agrees to return all Information, workproduct, and materials. *Id.*

The agreement also contains a non-solicitation clause with respect to Nicolet's customers.

It provides that the employee:

> acknowledges that the relationships between Staffworks, its clients, strategic partners and Customers are valuable assets of Staffworks. During the [Term], Employee agrees that Employee will not contact (directly or through another person or company) any then-current Staffworks Customer and/or strategic partner for the purposes of: (1) inducing them to terminate their relationship with Staffworks, (2) to discourage them from doing business with Staffworks, or (3) to offer to provide products or services that are similar to those of Staffworks. These prohibitions cover solicitations or contact on Employee's behalf, as an employee of a third party, as an independent contractor, consultant, or any other status, and apply whether the contact was initiated by Employee, the Customer, or a third party. The Employee has an affirmative duty to notify and acknowledge to any Customer who contacts the Employee that the Employee has entered into this Agreement.

*Id.* at ¶ 113.

The non-compete, non-disclosure, and non-solicitation (with respect to customers) covenants define the duration of the applicable term differently than the non-solicitation clause with respect to other company employees (described below). *Id.* at ¶ 115. The term for these three restrictive covenants is set forth as follows:

> As a condition of employment by Staffworks, Employee agrees to provide Staffworks with the covenants, protections and restrictions contained in this Agreement for the time period to include the latter of: 1) the term of employment by Staffworks; 2) one (1) year after termination of the Employee's employment; or 3) one (1) year after the termination of any contract or agreement with its Customers.

*Id.*

A separate non-solicitation clause with respect to *employees* in Nicolet's agreements bars a terminated employee, during the applicable term, from hiring, using, contracting, or soliciting for hire any individual "employed by Staffworks or who left their employment at Staffworks within ninety (90) days after Employee's last day of employment." *Id.* at ¶ 114. The term for purposes of this non-solicitation clause includes the employee's employment and "a period of one (1) year thereafter" where the employee "agrees not to contact Staff (or have someone else contact Staff) for the purpose of terminating their relationship with Staffworks or offering employment opportunities outside of Staffworks." *Id.*

The Agreements containing these restrictive covenants define customers to include clients of all the Staffworks companies. *Id.* at ¶ 113. Nicolet's New London Office served customers in the light industrial and supportive home care staffing sectors. DSMF, ¶ 75. Nicolet's complaint stated that it "terminates and renews customer contracts on a daily basis." *Id.* at ¶ 70; Complaint, ¶ 17. Defendants assert that no Nicolet customer or employee understood that its contracts terminated and renewed on a daily basis. DSMF, ¶ 70. While the number of customers considered

6

"active" that Sanders and Kienert handled at Nicolet's New London branch varied, they could recall the customers who were active "off the top of their head." *Id.* at ¶¶ 78–79.

Nicolet alleges that Defendants violated its restrictive covenants and improperly interfered with its business. This started with a "well-planned" departure plotted up to a year in advance when Sanders and Kienert formed a limited liability company in their own names in order to compete with Nicolet under their own "brand." PAF, ¶ 145. Besides forwarding emails to his personal account for future use and retaining confidential Nicolet documents upon his departure, Nicolet alleges that Sanders accessed the email accounts of Nicolet staff (without their consent or knowledge) to secretly observe activities in advance of his departure. *Id.* at ¶¶ 147–49. After meeting with Sanders, an SFS branch manager emailed SFS's President that Sanders "[f]eels he could bring around 1.8 M [Million] in sales to SFS from his book of business (Light Industrial, Semi Skilled)." *Id.* at ¶ 152. Nicolet believes this exchange reflects Sanders's plot to steal Nicolet's New London customers. *Id.* They also accuse Sanders of "temp-napping" based on his alleged efforts to move temporary employees who worked for Nicolet over to SFS. *Id.* at ¶ 165. SFS is also liable, according to Nicolet, for employing Sanders and Kienert in capacities that violate their contracts with Nicolet. *See* Complaint, ¶¶ 68–70.

Nicolet also contends that a number of trade secrets are at issue in this litigation. This includes information related to pricing, customers, finances, costs, marketing, operations, methodologies, protocols, research, performance, data, employees, software, and strategic business planning. Complaint, ¶ 5. Defendants dispute that Nicolet has plausibly identified any trade secrets. DSMF, ¶ 72.

## LEGAL STANDARD

Summary judgment is appropriate when the moving party shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In deciding a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party. *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 893 (7th Cir. 2018) (citing *Parker v. Four Seasons Hotel, Ltd.*, 845 F.3d 807, 812 (7th Cir. 2017)). The party opposing the motion for summary judgment must "submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (citations omitted). "[A] factual dispute is 'genuine' for summary judgment purposes only when there is 'sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.'" *Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). "[A] 'metaphysical doubt' regarding the existence of a genuine fact issue is not enough to stave off summary judgment, and 'the nonmovant fails to demonstrate a genuine issue for trial where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party.'" *Id.* (quoting *Logan v. Commercial Union Ins. Co.*, 96 F.3d 971, 978 (7th Cir. 1996)). Summary judgment is properly entered against a party "who fails to make a showing to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Austin v. Walgreen Co.*, 885 F.3d 1085, 1087–88 (7th Cir. 2018) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

## ANALYSIS

Defendants claim they are entitled to summary judgment on all of Plaintiffs' claims. Nicolet, joined by Plaintiff Zurich American Insurance Company, opposes this motion. Nicolet

8

asserted nine separate claims in its complaint: breach of contract against Defendants Sanders and Kienert (Counts I and II); tortious interference with contract against SFS and jointly against Sanders and Kienert (Counts III and IV); breach of fiduciary duty against Sanders and Kienert (Count V); aiding and abetting breach of fiduciary duty against SFS (Count VI); misappropriation of confidential information against Defendants (Count VII); misappropriation of trade secrets in violation of 18 U.S.C. § 1836 against Defendants (Count VIII); and misappropriation of trade secrets under Wis. Stat. § 134.90 against Defendants (Count IX).

## A. Declarations from Undisclosed Witnesses

Before turning to the merits of Defendants' motion for summary judgment, it is necessary to address an evidentiary dispute raised in Defendants' reply brief in support of their summary judgment. Dkt. No. 76 at 2. Defendants contend that Nicolet's response in opposition to Defendants' summary judgment motion included declarations from seven witnesses not previously disclosed. *Id.*

Rule 26(a) requires litigants to disclose "the name and, if known, the address and telephone number of each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment." Fed. R. Civ. P. 26(a)(1)(A)(i). Rule 26(e) imposes an ongoing duty to supplement those disclosures "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." Fed. R. Civ. P. 26(e)(1)(A). Under Rule 37, "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure

was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).  The Seventh Circuit has stated that the "exclusion of non-disclosed evidence is automatic and mandatory under Rule 37(c)(1) unless non-disclosure was justified or harmless."  *Musser v. Gentiva Health Servs.*, 356 F.3d 751, 758 (7th Cir. 2004) (citing *Finley v. Marathon Oil Co.*, 75 F.3d 1225, 1230 (7th Cir. 1996)).

Defendants claim that Nicolet failed to disclose the names of seven fact witnesses, including Joshua Gray, Charles P. Barnes, Denise Zunker, Jaquelyn Hernandez, Rachel Elson, Teresa Weidner, and Janice Brann.  Dkt. No. 76 at 2.  By not properly disclosing these additional fact witnesses in accordance with Rule 26, Nicolet deprived Defendants of a reasonable opportunity to depose these witnesses.  It is irrelevant whether Defendants had any intention of deposing these witnesses, as Nicolet contends.  To the extent that these were relevant witnesses, as Nicolet would surely argue, Defendants were owed the opportunity to depose them.

Nicolet argues that Defendants were sufficiently noticed of one witness because he appeared as a line item (along with other employees) in payroll documents produced by both parties and was mentioned by another witness in a deposition.  *See* Dkt. No. 57-25; Dkt. No. 58-16; Dkt. No. 81 at 3.  This is an unreasonable position.  In complex civil litigation, it is unfair to make litigants assume that every person mentioned in any way in discovery is presumptively a fact witness, particularly in employment matters where discovery can produce thousands of pages of documents.  Finding otherwise would undermine the notice requirement of Rule 26 and would purposelessly drive up the cost of litigation.  Nicolet's reservation of "all rights to call any and all appropriate witnesses at trial" or for impeachment purposes in its Rule 26 report does not free it from all ongoing obligations under Rule 26.  Dkt. No. 39-4 at 4.  Rule 26 itself contains this impeachment exception and does not save Nicolet here.  The use of witness declarations in Nicolet's opposition to Defendants' summary judgment motion is intended to provide discoverable

facts to support Nicolet's arguments; they are not for mere impeachment purposes. Because Nicolet attempted to use these statements to introduce new facts to oppose a dispositive motion, I do not find that their use was harmless or justified. Accordingly, the court will decline to consider these declarations.

## B. Breach of Contract–Restrictive Covenants

In Counts I and II of the complaint, Nicolet alleges that Sanders and Kienert breached the Non-Competition, Non-Disclosure, and Non-Solicitation Agreements they signed as a condition of their employment. Defendants contend that the Agreements are invalid and unenforceable.

Wisconsin law, which the parties agree applies, seeks to encourage "the mobility of workers." *Gary Van Zeeland Talent, Inc. v. Sandas*, 84 Wis. 2d 202, 214, 267 N.W.2d 242 (1978). In furtherance of this public policy, Wisconsin law disfavors restrictive covenants. *Behnke v. Hertz Corp.*, 70 Wis. 2d 818, 821, 235 N.W.2d 690 (1975). Under Wisconsin law, restrictive covenants in employment contracts are "prima facie suspect as restraints of trade that are disfavored at law and must withstand close scrutiny as to their reasonableness." *Star Direct, Inc. v. Dal Pra*, 2009 WI 76, ¶ 19, 319 Wis. 2d 274, 767 N.W.2d 898 (citing *Streiff v. Am. Family Mut. Ins. Co.*, 118 Wis. 2d 602, 611, 348 N.W.2d 505 (1984)). They also must be construed in favor of the employee. *Heyde Companies, Inc. v. Dove Healthcare, LLC*, 2002 WI 131, ¶ 16, 258 Wis. 2d 28, 654 N.W.2d 830. Restrictive covenants in Wisconsin are limited by statute:

> A covenant by an assistant, servant or agent not to compete with his or her employer or principal during the term of the employment or agency, or after the termination of that employment or agency, within a specified territory and during a specified time is lawful and enforceable only if the restrictions imposed are reasonably necessary for the protection of the employer or principal. Any covenant, described in this section, imposing an unreasonable restraint is illegal, void and unenforceable even as to any part of the covenant or performance that would be a reasonable restraint.

Wis. Stat. § 103.465.

To be enforceable under this provision, a restrictive covenant must "(1) be necessary for the protection of the employer, that is, the employer must have a protectable interest justifying the restriction imposed on the activity of the employee; (2) provide a reasonable time limit; (3) provide a reasonable territorial limit; (4) not be harsh or oppressive as to the employee; and (5) not be contrary to public policy." *Star Direct*, 319 Wis. 2d 274, at ¶ 20 (citing *Lakeside Oil Co. v. Slutsky*, 8 Wis.2d 157, 162–67, 98 N.W.2d 415 (1959)). Failing one of these "prerequisites" renders the entire provision invalid. *Manitowoc Co., Inc. v. Lanning*, 2018 WI 6, ¶ 41, 379 Wis. 2d 189, 906 N.W.2d 130. An unreasonable restriction will not be judicially construed to preserve its validity. Under the plain terms of the statute, if any part of the restriction is unreasonable, the entire covenant is void and unenforceable. § 103.465.

The Wisconsin Supreme Court has also held that the statute has broad application. Although Section 103.465 explicitly refers to a covenant not to compete, the Court has held that the plain meaning of the statute "is not limited to a covenant in which an employee agrees not to compete with a former employer." *Lanning*, 379 Wis. 2d 198, at ¶ 5. Viewing the explicit purpose of the statute as invalidating covenants that impose unreasonable restraints on employees, the Court has held that it applies as well to other contractual restraints on employees, including non-solicitation, nondisclosure, and confidentiality provisions. *Id.*, at ¶ 7.

Properly drafted, an employer may have a legitimate interest in an employment contract that restricts an employee's ability to contact its customers after their employment with the company ends. *See H & R Block E. Enterprises, Inc. v. Swenson*, 2008 WI App 3, ¶ 15, 307 Wis. 2d 390, 745 N.W.2d 421. This is true in an industry where particular employees deal regularly with the same customers and the "customer goodwill that comes from a positive relationship between a customer and the employee . . . is a valuable asset of the employer's business, and, for

12

some businesses, may be the most important asset." *Id.* Despite this legitimate interest, however, a restrictive covenant that "makes the duration of the restraint not a fixed and definite time period but a time period that is contingent upon outcomes the employee cannot predict" is unreasonable and therefore an unenforceable restraint on trade. *Id.*, at ¶ 20.

The Agreements signed by Sanders and Kienert fail this test. To repeat, each of the Agreements states that the covenants, protections, and restrictions contained therein are to run "for the time period to include the latter of: l) the term of employment by Staffworks; 2) one (l) year after termination of the Employee's employment; or 3) one (l) year after the termination of any contract or agreement with its Customers." PAF, ¶ 114. This provision is unreasonable because it is indefinite and unreasonably long. Logically, the third clause would most often, if not in all cases, apply. Once an employee left Nicolet, he or she would have no way of knowing when the one-year period under this clause begins. The employee would not know when Nicolet's contract or agreement with one of its customers was terminated. Indeed, the contract or agreement could continue for years after the employee leaves. Under the plain terms of the Agreements, the former employee would still be barred from soliciting the customer for a full year after such termination, whenever it occurs. Such a provision is in clear violation of Section 103.465.

Nicolet does not contest that this interpretation of its Non-Competition, Non-Disclosure, and Non-Solicitation Agreements would render them invalid. Instead, Nicolet argues that this interpretation is wrong. Nicolet argues that because some of its contracts terminate every day, the actual duration of the covenant under the third clause is one year, same as under the second clause. But Nicolet's interpretation makes no sense. It violates common rules of grammar, as well as those of contract interpretation by making the third clause superfluous. Even Nicolet's own President and CEO understood the provision to prohibit employees from contacting

13

customers for at least a year after the customer's contract with Nicolet was terminated, which in some cases lasted years or even decades. Because the time period for the restrictions is indefinite and potentially far in excess of any amount of time reasonably necessary to protect Nicolet's legitimate business interests, the restrictions are void and unenforceable.

The Agreements' employee non-solicitation clause deals solely with soliciting Nicolet's own employees and prohibits any employee of Nicolet from hiring, using, or contracting with "any individuals(s) [sic] employed by Staffworks" or those who left the company within the previous 90 days. PAF, ¶ 113. This clause has a different effective term than the other restrictive covenants at issue. To the extent the term in this clause applies, it seeks to bind Nicolet's employees during the term of their employment and for one year after their employment is terminated. *Id.* In *Lanning*, the Wisconsin Supreme Court found a non-solicitation clause overbroad and unenforceable when it prohibited the hiring of a company's entire workforce "[w]ithout a specified territory or class of employee." 379 Wis. 3d 198, at ¶ 59. After its acquisition of Nicolet, the Staffworks entities had over ten branches throughout Wisconsin and the upper peninsula of Michigan. PAF, ¶¶ 97, 100. Nicolet describes its internal "staff members" as those who "solicit new customers, service current customers, recruit temporary employees to work for the customers, and perform administrative functions." PAF, ¶ 82. As this non-solicitation clause applied to *all* Nicolet employees, it covered both those that held executive-level positions and its staff members who, by Nicolet's own description, held sales and administrative roles across its business region. This is not a clause that is limited to high-level or specialized employees or those employed in a limited geographic location. Instead, it is exactly the sort of overbroad restraint on trade that limits workplace mobility and competition. *See also Lakeside Oil*, 8 Wis. 2d at 163 ("An employer is not entitled to be protected against legitimate

14

and ordinary competition of the type that a stranger could give."). It is unenforceable for these reasons.

There are additional reasons why the restrictive covenants are unenforceable. The confidentiality provisions are overbroad because they extend indefinitely and are not limited to protectible trade secrets. There is no reason to protect sales and customer information indefinitely, and the effort to do so renders the provision void and unenforceable under Section 103.465.

The non-solicitation provision is likewise overbroad in both time and scope. The non-solicitation provision Nicolet claims Sanders and Kienert violated purports to extend to customers with whom they had no contact, as well as customers of other entities related to Nicolet but with whom neither Sanders or Kienert ever worked.

For these reasons, as well, the Non-Competition, Non-Disclosure, and Non-Solicitation Agreements are void and unenforceable. Defendants' motion for summary judgment is therefore granted with respect to Counts I and II.

**C. Breach of Fiduciary Duty**

Count V of the complaint alleges that Sanders and Kienert breached their fiduciary duties to Nicolet and Count VI alleges that SFS aided and abetted Sanders and Kienert in doing so. Defendants spend much of their response to these claims arguing that neither Sanders nor Kienert were fiduciaries, and thus, neither owed any fiduciary duty to Nicolet. It is doubtful that either could reasonably be considered a fiduciary at the time they left their employment at Nicolet. "Fiduciary relationships—such as trustee-beneficiary, guardian-ward, principal-agent, and attorney-client—require an unusually high degree of care." *Black's Law Dictionary* (11th ed. 2019). Sanders had been demoted from a district manager with responsibilities over several offices

15

Case 1:18-cv-00392-WCG   Filed 06/29/20   Page 15 of 24   Document 88

to a branch manager with supervisory authority over just the New London office. His other duties were also reduced, as was his salary. Nicolet's corporate representative acknowledged that after his demotion, Sanders had no responsibility for the strategic direction of Nicolet, no interactions with the executive team, and that Nicolet did not consider him to be a "key" employee. Kienert had never held responsibilities beyond the New London branch where she had always been stationed.

But whether they owed fiduciary duties or not seems somewhat of a "red herring." A duty of loyalty arises in many, if not all, employment relationships, *Hartford Elevator, Inc. v. Lauer*, 94 Wis. 2d 571, 575, 289 N.W.2d 280, 282 (1980), and it is this duty Sanders and Kienert are alleged to have breached. Nicolet's claims nevertheless fail, however, because even if they did owe Nicolet a fiduciary duty or a duty of loyalty, Nicolet has failed to offer any admissible evidence that they breached such a duty during the time they were employed by Nicolet. Once their employment terminated, so did any fiduciary duty or duty of loyalty they may have had, and thus their conduct afterwards is of no import to this claim.

As Defendants note, Sanders and Kienert did not breach any duty they owed Nicolet by leaving their at-will employment and going to work for a competitor. Because the restrictive covenants of the Non-Competition, Non-Disclosure, and Non-Solicitation Agreements they signed were void and unenforceable, Sanders and Kienert were free to seek better opportunities to use their talents and experience to benefit their new employer. For Sanders, leaving Nicolet appears to have been a logical reaction to the repeated demotions and threats of discharge he received prior to leaving. And once they left, they no longer owed any duty of loyalty to their former employer.

The complaint alleges that Sanders and Kienert engaged in various forms of wrongdoing in violation of their duty of loyalty prior to their departure, but when asked for evidence that they

16

solicited Nicolet's customers while still working for Nicolet, Nicolet's corporate designee admitted "We have no proof, none that I've seen." PAF, ¶ 51. Nicolet claims that upon inspecting its office after Sanders left, it found files "rifled through" and contracts missing. At the same time, however, Nicolet admits that Sanders' alleged deletion of emails did nothing to harm its business interests because all relevant information, including customer contracts, was left undisturbed in Avionte, its critical business database that runs every aspect of its business. Although Nicolet's responses to these proposed findings of fact asserted in support of Defendants' motion for summary judgment offer only grudging partial admissions to Defendants' proposed statements of fact and attempt to qualify and minimize even those, Nicolet has offered no admissible evidence of its own to support its claim that, while still employed by Nicolet, Sanders and Kienert breached their duties of loyalty and thereby caused Nicolet injury. For this reason, its claims for breach of fiduciary duties against Sanders and Kienert and aiding and abetting such breach against SFS fail.

### D. Misappropriation of Trade Secrets in Violation of Wis. Stat. § 134.90 and 18 U.S.C. § 1836

Nicolet alleges that its trade secrets were misappropriated under federal and state law. Like many other states, Wisconsin has enacted a version of the Uniform Trade Secrets Act (UTSA), Wis. Stat. § 134.90, which protects against improper disclosure or acquisition of trade secrets through misrepresentation, bribery, theft, espionage, and other improper means.

Under Wis. Stat. § 134.90(1)(c), a trade secret is "information, including a formula, pattern, compilation, program, device, method, technique or process" where such information both (1) "derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use" and (2) "is the subject of efforts to maintain its secrecy that are reasonable under the circumstances." An actionable claim requires that the trade secret be

misappropriated—either acquired through improper means or disclosed or used without express or implied consent. *See* Wis. Stat. § 134.90(2)(a)–(b).

Nicolet's federal claim for misappropriation of a trade secret under the Defend Trade Secrets Act (DTSA), 18 U.S.C. § 1836, similarly turns on whether the information Nicolet believes deserves protection is in fact a "trade secret." The DTSA defines trade secret to cover substantially similar types of information that would amount to a trade secret under the UTSA. *See* 18 U.S.C. § 1839(3) ("all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes . . ."). The court will therefore apply the same analysis to Nicolet's efforts to establish that its information deserves trade secret protection under both the UTSA and DTSA. *See also Kuryakyn Holdings, LLC v. Ciro, LLC*, 242 F. Supp. 3d 789, 797–98 (W.D. Wis. 2017) ("[T]he court's analysis will use Wisconsin's UTSA, but the analysis would apply as well to the DTSA."); *Bombardier Inc. v. Mitsubishi Aircraft Corp.*, 383 F. Supp. 3d 1169, 1178 (W.D. Wash. 2019) ("The relevant portions of the DTSA and the UTSA are almost identical.").

Secrecy is central to whether information is a trade secret under the UTSA. "A trade secret has value only so long as the knowledge involved can be concealed." *Rototron Corp. v. Lake Shore Burial Vault Co., Inc.*, 553 F. Supp. 691, 698 (E.D. Wis. 1982). Other relevant factors include:

> the extent to which the information is known outside of his business; (2) the extent to which it is known by employees and others involved in his business; (3) the extent of measures taken by him to guard the secrecy of the information; (4) the value of the information to him and to his competitors; (5) the amount of effort or money expended by him in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Minuteman, Inc. v. Alexander*, 147 Wis. 2d 842, 851, 434 N.W.2d 773 (1989) (citing *Corroon & Black-Rutters & Roberts, Inc. v. Hosch*, 109 Wis. 2d 290, 295, 325 N.W.2d 883). The alleged trade secrets must also be identified with specificity. *See IDX Sys. Corp. v. Epic Sys. Corp.*, 285 F.3d 581, 583 (7th Cir. 2002) ("[U]nless the plaintiff engages in a serious effort to pin down the secrets a court cannot do its job."); *Composite Marine Propellers, Inc. v. Van Der Woude,* 962 F.2d 1263, 1266 (7th Cir. 1992) ("It is not enough to point to broad areas of technology and assert that something there must have been secret and misappropriated. The plaintiff must show concrete secrets."); *ECT Int'l, Inc. v. Zwerlein*, 228 Wis. 2d 343, 351, 597 N.W.2d 479, 483 (Ct. App. 1999) ("Other courts that have decided whether a trade secret has been described with sufficient specificity have all required more than a generalized allegation that there was a protectible secret.").

While determining whether information is a trade secret is "one of the most elusive and difficult concepts in the law to define" and may generally be a question of fact, summary judgment remains appropriate where the opposing party has not identified any genuine issue of fact. *Centrifugal Acquisition Corp. v. Moon*, 849 F. Supp. 2d 814, 831 (E.D. Wis. 2012) (quoting *Lear Siegler, Inc. v. Ark–Ell Springs, Inc.*, 569 F.2d 286, 288 (5th Cir. 1978)). It is entirely unfair for a plaintiff to identify general categories of what may constitute a trade secret and essentially force the defendant to guess what may be at issue until a jury trial.

Plaintiffs contend that Nicolet's trade secrets include (1) its customer list, (2) the profitability of its lucrative light industrial customers, (3) the identity of temporary workers for its most profitable home care client (including those it preferred), (4) the identity of a "critical mass of 30-40 core temporary workers" that worked for customers of Nicolet's New London branch, (5) the ability to recruit temporary workers in the New London area by incorporating "Indeed.com

19

as the core recruiting strategy," and (6) the "applicant profile" Nicolet and Sanders developed and was preferred by Nicolet's New London customers.  Dkt. No. 55 at 34.[1]

Defendants argue that Nicolet fails to show that information regarding its operations and profits merits trade secret status with the required specificity.  The court agrees.  Plaintiffs allege that the "profitability of Nicolet's most lucrative light industrial customers" is a trade secret, but by itself this fact is too vague to establish a trade secret.  While this information may be valuable in the temporary staffing industry, "light industrial" is not an especially particularized category.  Nor is it sufficient to carry Plaintiff's argument that Defendants stole information that could be properly protected in the first place.  In fact, with some effort, it seems like information that could easily be duplicated.  Like many of its claims, Nicolet works backwards from the fact that it lost all of its business in one branch to assert that it was undeniably wronged by Defendants.  *See* PAF, ¶ 174, 182.  But this loss could reflect nothing other than ordinary business competition.  More must be done to support a plausible claim.

Nicolet's claim that its recruiting strategy involving Indeed.com is a trade secret also fails. This claim does not meet the basic elements of the statute as it is not information that would remain secret if the strategy itself depends on job advertisements that would ultimately be disclosed to the

---

[1] Nicolet also summarized its alleged trade secrets in written discovery to include the following:

- Nicolet's customer list, and the information contained therein, including but not limited to Nicolet's proprietary list of home-care clients;
- Information concerning Nicolet's temporary employees, including information concerning their identity, contracts with Nicolet, compensation, and work history;
- Information concerning Nicolet's customers, including but not limited to customer contacts, preferences, relationships and contracts with Nicolet, history and needs; and
- Information concerning Nicolet's operations, including Nicolet's pricing, costs and margins for Nicolet's dealings with its customers.

DSMF, ¶ 74; Dkt. No. 47-19 at 8.

Case 1:18-cv-00392-WCG   Filed 06/29/20   Page 20 of 24   Document 88

public.  *See* Wis. Stat. § 134.90(1)(c)(2) (requiring that the information "is the subject of efforts to maintain its secrecy"); Dkt. No. 78 at 4.  As the Seventh Circuit has observed, "things that any user or passer-by sees at a glance are 'readily ascertainable by proper means.'"  *IDX Sys. Corp.*, 285 F.3d at 584.  Because SFS did not use Indeed.com before Sanders joined the company does not mean that its use is a trade secret.  *See* Dkt. No. 78 at 4.  And, in any event, the use of a publicly available online platform like Indeed.com as a business strategy in this manner does not amount to a trade secret.

The remaining trade secret claims revolve around information pertaining to Nicolet's list of customers and temporary employees.  In some cases, a customer list may qualify as a trade secret.  *See Nalco Chem. Co. v. Hydro Techs., Inc.*, 984 F.2d 801, 803 (7th Cir. 1993), *as amended on denial of reh'g* (Mar. 18, 1993) (citing *Minuteman, Inc.*, 147 Wis.2d at 851).  A customer list may be a trade secret "when the nature of the industry permits the list to be kept secret and the list cannot readily be duplicated by independent means." *Abbott Labs. v. Norse Chem. Corp.*, 33 Wis. 2d 445, 467, 147 N.W.2d 529 (1967).  However, "[b]are bones listings of customer information, such as names, addresses, phone numbers, and contact persons, have been routinely rejected by the Wisconsin courts as constituting a trade secret."  *Share Corp. v. Momar Inc.*, No. 10-CV-109, 2011 WL 284273, at *9 (E.D. Wis. Jan. 26, 2011).

Nicolet relies heavily on how its customer list was "meticulously stored and analyzed in the robust and expensive Avionte software."  Dkt. No. 55 at 35.  Nicolet did not develop this software itself, however, and it appears that much of what made this information valuable was developed through Avionte's rendering of the data that Nicolet inputted into the software.  And with respect to what it inputted, Nicolet has failed to show that its customer list or related information was kept sufficiently secret or was impossible to duplicate.  Its reliance on the fact

that the New London market is only 30,000 people further undermines its efforts.  *See* Dkt. No. 55 at 35.  In a town of this size, there are only so many potential temporary employees or customers.  In fact, Sanders and Kienert could recall all their customers off the top of their heads.  DSMF, ¶ 79.  It is therefore very likely that the identity of these customers and pool of temporary employees could be deduced through public sources, observation, and a competitor's own recruiting efforts.  Nicolet's situation is not unlike that of the talent booking agency in *Sandas* where the Wisconsin Supreme Court found that its list of customers could be "located easily through telephone directories, calls to chambers of commerce, and newspaper advertising" and was not a trade secret.  *Gary Van Zeeland Talent, Inc. v. Sandas*, 84 Wis. 2d 202, 212, 267 N.W.2d 242 (1978).  And while Nicolet asserts it must keep its customer list a trade secret, it has publicly identified its customers in other instances.  For example, it states that Ocean Spray is one of its customers in its complaint for this action, on its Facebook account, and in advertisements.  Dkt. No. 78 at 53.  Plaintiffs have failed to show that Nicolet has information that deserves trade secret protection.  Accordingly, Defendants' motion for summary judgment is granted with respect to Counts VIII and IX.

### E.  Common Law Claim for Misappropriation of Confidential Information

Defendants contend that there is no actionable claim under Wisconsin law for the misappropriation of confidential information, apart from the Wisconsin Uniform Trade Secrets Act, Wis. Stat. § 134.90.  Plaintiffs cite this court's decision in *Marine Travelift, Inc. v. Marine Lift Sys., Inc.* to argue otherwise, but this reliance is misplaced.  Dkt. No. 55 at 33.  The court concluded there that "Wisconsin does not recognize a claim of misappropriation of confidential and proprietary information as a separate and independent tort."  No. 10-C-1046, 2013 WL 6255689, at *8 (E.D. Wis. Dec. 4, 2013).  Plaintiffs also rely on the Wisconsin Supreme Court's

decision in *Burbank Grease Services, LLC v. Sokolowski* to support their argument that "misappropriation of confidential information" amounts to an actionable claim. 2006 WI 103, ¶ 11, 294 Wis. 2d 274, 717 N.W.2d 781. But there, too, the court determined otherwise. The Wisconsin Supreme Court held that "any civil tort claim not grounded in a trade secret, *as defined in the statute* [Wis. Stat. § 134.90], remains available." *Id.*, at ¶ 33 (emphasis in original). But the court did not hold that there was a wholly independent cause of action for misappropriation of confidential information, as Plaintiffs contend. Instead, the plaintiff in *Burbank* had asserted claims of misappropriation of trade secrets in violation of Wis. Stat. § 134.90, breach of the duty of loyalty, tortious interference with business relationships, and computer crimes, among other allegations. As this court concluded in *Marine Travelift*, an alleged disclosure of confidential business information may be actionable under other theories of liability that resulted from such disclosure or misuse. 2013 WL 6255689, at *8. This does mean that "misappropriation of confidential information" not covered by § 134.90 is by itself a separate, actionable claim. Instead, it supports other viable causes of action. Thus, Count VII fails.

**F.  Tortious Interference with Contractual Relations**

Count III of the complaint asserts a claim for tortious interference against Sanders and Kienert, and Count IV asserts such a claim against SFS. To establish a prima facie case of tortious interference with a contract under Wisconsin law, the plaintiff must show that "(1) the plaintiff had a contract or prospective contractual relationship with a third party; (2) the defendant interfered with the relationship; (3) the interference was intentional; (4) a causal connection exists between the interference and the damages; and (5) the defendant was not justified or privileged to interfere." *Burbank Grease Servs.,* 2006 WI 103, at ¶ 44 (quoting *Hoey Outdoor Advert., Inc. v. Ricci*, 2002 WI App 231, ¶ 27, 256 Wis. 2d 347, 653 N.W.2d 763)). Moreover, interference is actionable only

23

if it is intentional and improper.  *See Foseid v. State bank of Cross Plains*, 197 Wis. 2d 772, 788, 541 N.W.2d 203 (Ct. App.1995) (citing *Cudd v. Crownhart*, 122 Wis. 2d 656, 660, 364 N.W.2d 158 (Ct. App.1985)).

Plaintiffs argue that Defendants Sanders and Kienert improperly interfered with Nicolet's relationships with customers and potential customers, including temporary employees and staff. Dkt. No. 55 at 29.  These claims fail for the simple reason that Nicolet is unable to establish that Defendants' actions were improper.  For the reasons set forth above, the court has already determined that the restrictive covenants on which Nicolet relies are void and unenforceable.  Thus, Sanders' and Kienert's conduct was not in breach of their contracts with Nicolet.  Likewise, the court has concluded on the undisputed evidence before it that Defendants did not breach any fiduciary duty they owed Nicolet or misappropriate any trade secrets.  Given these conclusions, Nicolet is unable to establish that Defendants' conduct was improper.  As employees of Nicolet's competitor, Sanders and Kienert were free to use their knowledge and experience to further the interests of their new employer.  And since Nicolet's claim that SFS committed tortious interference depends on its claims against Sanders and Kienert, it fails as well.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment (Dkt. No. 41) is **GRANTED** and all claims are dismissed with prejudice.  The Clerk is directed to enter judgment in Defendants' favor and against Plaintiff.

**SO ORDERED** at Green Bay, Wisconsin this 29th day of June, 2020.

s/ William C. Griesbach
William C. Griesbach
United States District Judge